# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| | ORDER |
| vs. | |
| THOMAS E. MOWER, LESLIE D. MOWER, JAMES THOMPSON, | Case No.  2:02CR787DAK |
| Defendants. | |

This matter is before the court on Leslie D. Mower's Expedited Motion to Consider the Recent Tenth Circuit Opinion *Wedelstedt v. Wiley* Dated February 20, 2007.

As recognized by the Tenth Circuit, 18 U.S.C. Section 3621(b) confers upon the Bureau of Prisons qualified discretion to designate a prisoner's place of imprisonment. *Wedelstet v. Wiley*, 2007 WL 512517 (10ᵗʰ Cir. Feb. 20, 2007).  Among the five factors the BOP must consider in making its designation is "any statement by the court that imposed the sentence–(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate."  18 U.S.C. § 3621(b).

Because the BOP has the ultimate discretion in making the designation of a facility, this court can only make a recommendation that the BOP must consider among the other four factors

1

in Section 3621(b). *Wedelstedt* makes clear that the BOP must consider the five factors in Section 3621(b) in making its designation of a facility without regard to the regulations limiting the designation of a community correction center to the last ten percent of an inmates sentence. *Id.* at *6-8.

In this case, the court found Leslie D. Mower's offense level at a level 18, which places her in Zone D. The United States Sentencing Guideline § 5C1.1(f) states: "[I]f the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment." The court previously found that this was a guidelines case, rejected Defendant Leslie D. Mower's 18 U.S.C. § 3553 factors, and sentenced her to a term of 27 months imprisonment.

Defendant's current back problems have arisen since sentencing. Although the court will not affirmatively recommend placement in a community correctional center, the court would not oppose Defendant Leslie D. Mower's placement in a community correctional center. Her current health problems and the fact that such a placement would afford her increased access to her treating physicians certainly weigh in favor of such a placement. She also poses no threat to the community.

However, even if the court recommended that Defendant be designated to a community correction center, the court's recommendation is only one factor out of five that the BOP must consider in making its designation. It is not the court's role to consider the remaining factors relevant to a decision regarding her proper designation. The BOP alone is given the discretion of making the proper designation. Defendant can present these statements by the court to the BOP

2

for their consideration in its determination.

DATED this 28th day of February, 2007.

DALE A. KIMBALL,
United States District Judge

# EXHIBIT H



**U.S. Department of Justice**

**Federal Bureau of Prisons**

---

*Washington, D.C. 20534*
December 20, 2002

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

                    /s/
FROM:          Michael B. Cooksey, Assistant Director
                  Correctional Programs Division


                    /s/
                  Christopher Erlewine
                  Assistant Director/General Counsel

SUBJECT:       Community Confinement Procedure Changes


    This memorandum informs you of procedure changes related to the Bureau's designation of inmates to community correction centers (CCC) to serve terms of imprisonment. These procedure changes are the result of a recent legal opinion issued by the U.S. Department of Justice, Office of Legal Counsel (OLC), which analyzes the Bureau's statutory authority to designate inmates to CCCs as more limited than we have previously practiced. A copy of the OLC opinion is included with this memorandum.

    **This memorandum should be distributed to all staff who are affected by the procedure changes.**

    For further implementation assistance, please contact Stew Rowles, Community Corrections Administrator, at , or J.Paul Horner, Administrator, Correctional Programs Branch, . For staff legal assistance, please contact your Regional Counsel. Advise inmates wishing to challenge any aspect of this revised procedure to do so through the Bureau's administrative remedy program.

## THE BUREAU'S CCC DESIGNATION AUTHORITY DEFINED

Effective immediately, the Bureau's CCC designation authority is defined as follows:

(1) **The Bureau will no longer accommodate judicial recommendations for direct CCC placement of inmates sentenced to terms of imprisonment** (hereinafter referred to as "direct-court placement inmates"). Rather, all inmates serving terms of imprisonment must be designated by the Bureau to prison or jail facilities. This prohibition applies to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau; and

(2) **Pre-release programming CCC designations are limited in duration to the last 10% of the prison sentence, not to exceed six months**. This limitation, and the following two exceptions, apply to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau:

  - Inmates completing the Residential Drug Abuse Program (RDAP) may exceed the 10% limitation, but are still limited to a maximum six-months pre-release CCC designation; and

  - Inmates completing an Intensive Confinement Center (ICC) program may exceed both the 10% and six-months limitations, at this time. The OLC opinion's impact on this issue is still being reviewed, and further guidance will be forthcoming.

## IMPLEMENTATION PROCEDURES

There are three phases to implementing these procedure changes. First, some direct-court placement inmates must be promptly re-designated to prison or jail facilities depending on the amount of time left to serve on their prison terms. Second, future pre-release CCC designation cases must be immediately reviewed to ensure compliance with this revised procedure before the inmates depart their parent institution. Third, female inmates participating in the Mothers and Infants Nurturing Together (MINT) program will be authorized by furloughs rather than CCC designations.

- 2 -

**Re-Designation of Direct-Court Placement Inmates.**

Direct-court placement inmates who, as of December 16, 2002, had more than 150 days left to serve on their prison sentences, must be re-designated to prison or jail facilities. This calculation results in a date of May 15, 2003. **Accordingly, direct-court placement inmates who, as of December 16, 2002, had a projected release date of May 15, 2003, or later, must be re-designated to prison or jail facilities.**

Rosters identifying these inmates are attached. However, each community corrections office (CCO) needs to thoroughly review the direct-court placement inmate population to ensure compliance with this directive. CCO staff will need to closely review each identified case to ensure that the individual inmate is actually residing in a CCC, rather than a prison or jail facility, and if so, to determine the appropriate transfer method to the re-designated facility. CCOs should work closely with Regional Designators to secure placement at the nearest appropriate facility.

Also, when re-designating direct-court placement inmates to prison or jail facilities:

(1)   Notify the sentencing judge of the inmate's re-designation. A sample letter for your use is included with this memorandum; and

(2)   Provide the inmate written notice of the re-designation at least 30 days prior to being transferred. A sample memorandum for your use is included with this memorandum. At least 30 days must pass between the date the inmate receives the written notice, and the actual transfer.

**Pre-Release CCC Inmates.**

The individual cases of all inmates being considered for pre-release CCC placement must be immediately reviewed for compliance with this revised procedure. Inmates who, at the time of record review by Bureau staff pursuant to this memorandum, have not yet departed their parent institutions en route to the CCC, must have their pre-release CCC designation plan adjusted accordingly to comply with this revised procedure, i.e., limited in duration to the last 10% of the prison sentence, not to exceed six months.

**MINT Program Participants.**

Female inmates participating in the MINT program are affected by the new limits placed on CCC designations. Consequently, the authority and procedures for MINT program participants are modified as follows.

The Bureau will now rely on its statutory furlough authority, 18 U.S.C. §§ 3622(a)(5), to facilitate MINT program participation. Under this authority, the Bureau may release a prisoner from the place of imprisonment for a period not to exceed 30 days for the purpose of establishing, or re-establishing, family or community ties. In order to facilitate these furloughs, every MINT program inmate must be initially designated to a Bureau institution from which to be furloughed to a MINT program.

Additionally, because MINT program participation under the furlough authority is limited to 30 day periods, the Warden of an inmate's parent institution must re-assess the need for such programming every 30 days. If deemed appropriate, the Warden of the parent institution may renew the inmate's MINT program participation for an additional 30 day period. This process may be repeated as often as necessary to fulfill the inmate's MINT program objectives, and must be determined on an individual basis.

Further guidance for MINT program participants will be forthcoming. In the interim, specific questions should be directed to Valerie Martin, Administrator, Special Needs Offender Program, at          .

## FREQUENTLY ASKED QUESTIONS

The following are anticipated questions and answers related to this revised procedure.

### How are inmates participating in RDAP affected by these revised procedures?

All inmates who successfully complete the unit-based RDAP are still able to receive a six-months CCC placement. The 10% limitation does not apply to this group of inmates, regardless of early release eligibility status. Accordingly, the policy and current practice of recommending up to 180 days CCC placement for RDAP graduates (both 3621(e) eligible and ineligible) remains the same. Central Office review of all early release cases is also unaffected.

- 4 -

***What if the media asks questions about this revised procedure?***

Inquiries from the media regarding any aspect of this revised procedure should be referred to the Bureau's Office of Public Affairs, Central Office, at (202) 307-3198.

# EXHIBIT I



**U.S. Department of Justice**

**Federal Bureau of Prisons**

_Office of the Director_                    _Washington, DC 20534_

December 20, 2002

MEMORANDUM FOR FEDERAL JUDGES

FROM:        _Kathleen Hawk Sawyer_
             Kathleen Hawk Sawyer
             Director

SUBJECT:        Community Confinement Procedure Change

    This memorandum informs you that the Bureau of Prisons
(Bureau) is implementing a significant procedure change regarding
inmate designations to community correction centers (CCC) (also
known as "halfway-houses"). The Bureau has had a practice of
honoring some judicial recommendations to place inmates in CCCs
for the imprisonment portions of their sentences. Effective
immediately, this practice will no longer be followed. The Bureau
will not use CCCs as a substitute for imprisonment.

    This procedure change follows recent guidance from the U.S.
Department of Justice's Office of Legal Counsel (OLC), finding
that the term "community confinement" is not synonymous with
"imprisonment." OLC has determined that the Bureau's practice of
using CCCs as a substitute for imprisonment contravenes well-
established caselaw, and is inconsistent with U.S.S.G. § 5C1.1.

    This procedure change will be implemented prospectively,
with the following exception. Inmates designated to CCCs who, as
of December 16, 2002, had more than 150 days remaining to serve
on their prison terms, will be re-designated by the Bureau to
prison institutions.

# EXHIBIT J

**Docket No. 06-2692-pr**
(consolidated with 06-2693-pr)
==================================================================

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

### RICHARD MUNIZ,

Petitioner- Appellee,

v.

### CAROLYN A. SABOL, Warden,

### Devens Federal Medical Center -- Ayer, Massachusetts,

Respondent- Appellant.

---

ON APPEAL FROM JUDGMENTS OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

====================

## BRIEF FOR FAMILIES AGAINST MANDATORY MINIMUMS FOUNDATION, THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS AND THE CRIMINAL JUSTICE ACT BOARD FOR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

====================

PETER GOLDBERGER
*First Cir. Bar # 12112*
50 Rittenhouse Place
Ardmore, PA  19003-2276
(610) 649-8200
fax: 610-649-8362
peter.goldberger@verizon.net

Vice-Chair, NACDL Amicus Comm.

Attorney of Record for Amici

(Additional counsel on inside cover)

Additional Counsel:

TODD A. BUSSERT
103 Whitney Ave.
New Haven, CT  06510-1229
  (203) 495-9790

MARY PRICE, General Counsel
Families Against Mandatory
  Minimums Foundation
1612 K St., NW - Suite 700
Washington, DC  20006

Co-Counsel for NACDL    (202) 822-6700

CHARLES W. RANKIN
  *First Cir. Bar # 13049*
RANKIN & SULTAN
151 Merrimac St., 2d Fl.
Boston, MA 02114-4717
  (617) 720-0011

MICHAEL L. WALDMAN
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP, Ste. 900
1001 Pennsylvania Ave., NW,
Washington, DC  20004-2505
  (202) 639-7096

Counsel for CJA Board

Co-Counsel for FAMM Foundation

# TABLE OF CONTENTS

Table of Authorities ................................................................. ii

Identity and Interest of Amici Curiae .................................... 1

Issue Presented by Amici ...................................................... 3

Summary of Argument ........................................................... 4

Argument for Amici Curiae .................................................... 9

    THE FAILURE OF THE BOP TO ADDRESS FACTS AND
    ARGUMENTS ADVANCED IN PUBLIC COMMENTS
    RENDERED THE FINAL RULE LIMITING CCC UTILIZATION
    ARBITRARY AND CAPRICIOUS ............................................ 5

        A.  Eliminating Disparity Where None Existed ......................... 14

        B.  Nothing About CCC Resources Warrants Limiting Placement to
        the Final Ten Percent of a Prisoner's Time Served ................... 20

        C.  Sentencing Commission "Policy" Does Not Disfavor BOP's
        Traditional CCC Usage ......................................................... 26

        D.  A Presumed Enhancement of Deterrence Cannot Justify
        Disregard of a Congressional Mandate to Classify Sentenced
        Prisoners ............................................................................. 28

        E.  Other Concerns Raised: Cost-Effectiveness ....................... 29

Conclusion ............................................................................ 30

Certificate of Compliance ...................................................... 31

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

Ashkenazi v. Attorney General, 346 F.3d 191 (D.C.Cir., Oct. 14, 2003) ........... 12

Brewer v. Madigan, 945 F.2d 449 (1st Cir. 1991) ................................. 6

Bugarin-Juarez v. Weiss, 76 Fed.Appx. 773, 2003 WL 21949137
    (9th Cir., Aug. 13, 2003) (mem.) ............................................... 12

Burlington Truck Lines v. United States, 371 U.S. 156 (1962) ............................ 8

Castellini v. Lappin, 365 F.Supp.2d 197 (D.Mass. 2005) .................................... 13

Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,
  59 F.3d 284 (1st Cir. 1995) ..................................................... 7, 8

Culter v. United States, 241 F.Supp.2d 19 (D.D.C. 2003) ................................... 18

Dismas Charities, Inc. v. U.S. Dept. of Justice, 287 F.Supp.2d 741
  (W.D.Ky. 2003), aff'd, 401 F.3d 666 (6th Cir. 2005) .................... 12, 17, 21

Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273 (1st Cir. 1996) ............... 6, 7

E.I. Dupont de Nemours & Co. v. Cullen, 791 F.2d 5 (1st Cir. 1986) ................. 9

Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004) ..................................................... 12

Ferguson v. Manco, No. 03-2083 (2d Cir., dismissed Jan. 5, 2004) ................... 12

Fristoe v. Thompson, 144 F.3d 627 (10th Cir. 1998) ........................................... 5

Goldings v. Wynn, 383 F.3d 17 (1st Cir. 2004) ................................ 2, 5, 9, 12, 27

Iacaboni v. United States, 251 F.Supp.2d 1015 (D.Mass. 2003) .................. 17, 19

Koon v. United States, 518 U.S. 81 (1996) ........................................................... 20

Lopez v. Davis, 531 U.S. 230 (2001) .................................................................... 8

Martin v. Gerlinski, 133 F.3d 1076 (8th Cir. 1998) ............................................. 5

Massachusetts v. Westcott, 431 U.S. 322 (1977) (per curiam) ............................. 9

Motor Vehicle Manufacturers Ass'n v.
  State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983) ............ 4-8, 30

Muniz v. Winn, 462 F.Supp.2d 175 (D.Mass 2006) ........................................... 17

Natural Res. Def. Council v. U.S. EPA, 824 F.2d 1258 (1st Cir. 1987) ........... 6, 8

Public Citizen, Inc. v. Mineta, 340 F.3d 39 (2d Cir. 2003) ........................... 29, 30

Quezada-Ruiz v. Nash, 2005 WL 1398503 (D.N.J., June 14, 2005) .................. 20

Reno v. Koray, 515 U.S. 50 (1995) ...................................................................... 27

United States v. Adler, 52 F.3d 20 (2d Cir. 1995) (per curiam) .......................... 27

United States v. Arthur, 367 F.3d 119 (2d Cir. 2004) ......................................... 12

United States v. Booker, 543 U.S. 220 (2005) ................................................. 1, 27

United States v. Mendoza, 464 U.S. 164 (1984) ................................................. 12

United States v. Restrepo, 999 F.2d 640 (2d Cir. 1993) ...................................... 20

**Constitution, Statutes and Rules:**

5 U.S.C. § 706(2) ............................................................ 5, 8
18 U.S.C. § 3553(a) ........................................................... 28
18 U.S.C. § 3621(b) ....................................................... passim
18 U.S.C. § 3624(c) .................................. 12, 14, 22, 24, 25, 29
18 U.S.C. § 3625 .............................................................. 5
18 U.S.C. § 4046 ............................................................. 13
18 U.S.C. § 4081 ............................................................. 10
18 U.S.C. § 4082(b) (superseded) ...................................... 10, 11
18 U.S.C. 3553(a) ........................................................... 14
28 U.S.C. § 994(a) .......................................................... 26
28 U.S.C. § 2241(a) .......................................................... 5
28 U.S.C. § 2253(a) .......................................................... 5

Pub. L. No. 71-218, 46 Stat. 325 ...................................... 10
Pub. L. No. 89-176, 79 Stat. 674 ...................................... 10

USSG § 5C1.1 ........................................................ 14, 26, 27
USSG § 5K2.0 (p.s.) ........................................................ 27

**Miscellaneous:**

69 Fed. Reg. No. 159 (Aug. 18, 2004) ......................... passim

70 Fed. Reg. No. 6 (Jan. 10, 2005) ............................. passim

Admin.Off. U.S. Courts, Costs of Incarceration,
    http://realcostofprisons.org/blog/archives/2006/06/
    cost_of_incarce.html (June 6, 2006) .......................... 29

Ashcroft, Prepared Remarks at the Dept. of Justice Offender Re-Entry
    Conference (Cleveland, OH, Sept. 20, 2004) ................. 26

Bush, Remarks by the President to the 2004 National Urban League Conference
    (July 23, 2004) ................................................... 26

T. Bussert and J. Sickler, Bureau of Prisons Update, Champion (NACDL, March
    2005), http://www.nacdl.org/public.nsf/
    01c1e7698280d20385256d0b00789923/
    9680f6ffdb2ad49e85256fdc00525110?OpenDocument ............. 13

Todd Bussert, Peter Goldberger and Mary Price, New Time Limits on Federal
    Halfway Houses: A shift in correctional policy, 21 Criminal Justice 1, 22-23
    (ABA Spring 2006) ........................................... 11, 16

Dan Eggen, White-Collar Crime Now Gets Real Time:  New Federal Prison
    Policy Criticized, Washington Post (Jan. 7, 2003) .............. 11

GAO, Prison Alternatives:  Crowded Federal Prisons Can Transfer More Inmates
    to Halfway Houses (Nov. 1991) ............................ 25, 29

H.R. Rep. No. 106, 71st Cong., 2d Sess. 1 (1930) ............... 10

ICCA, The Case for Community-Based Sanctions and Reentry
    Programming (April 2003), http://www.iccaweb.org/ .................................. 18

J. Klein-Saffran, Electronic Monitoring vs. Halfway Houses: A Study of Federal
    Offenders in ALTERNATIVES TO INCARCERATION (Fall 1995) ....................... 22

Eric Lichtblau, Criticism of Sentencing Plan for White-Collar Criminals, N.Y.
    Times (Dec. 26, 2002) .............................................................................. 18

Memorandum for Federal Judges,
    http://www.nacdl.org/public.nsf/newsreleases/2003 mn005?
    open document (BOP 12/20/2002) ............................................................. 16

Norval Morris, Foreword in ESCAPING PRISON MYTHS: SELECTED TOPICS
    IN THE HISTORY OF FEDERAL CORRECTIONS (Amer. U. Press, 1994) ............ 10

John W. Roberts, Introduction in ESCAPING PRISON MYTHS: SELECTED TOPICS IN
    THE HISTORY OF FEDERAL CORRECTIONS (American Univ. Press, 1994) ..... 10

Stuart Rowles, 47 Community Update: Notes to BOP's Local Partners
    (Dec. 2005) ............................................................................................... 9

Stuart Rowles, 48 Community Update: Notes to BOP's Local Partners
    (May 2006) ............................................................................................... 9

S. Rep. No. 71-533, 71st Cong., 2d Sess. 2 (1930) ............................................ 10

S.Rep. No. 98-225, 98th Cong., 1st Sess. (1983) ................................................ 10

USDOJ-BOP, Judicial Guide to the Federal Bureau of Prisons (1995) ........ 19, 25

USDOJ-BOP, Judicial Resource Guide to the Federal Bureau of Prisons (2000) ....
    20

USDOJ-BOP Prog. Smt. 5390.88, Intensive Confinement Center (ICC) Program
    (Nov. 4, 1999) ......................................................................................... 15

USDOJ-BOP Prog. Smt. 7310.04, Community Corrections Center (CCC)
    Utilization and Transfer Procedure (Dec. 16, 1998) ......................... 8, 19, 23

USDOJ-BOP, Weekly Population Report ........................................................... 10

USSC/USDOJ-BOP, Joint Report to Congress: Maximum Utilization
    of Prisons Resources (June 30, 1994) ................................................. 21, 27

## IDENTITY AND INTEREST OF AMICI CURIAE

Families Against Mandatory Minimums Foundation ("FAMM"), the National Association of Criminal Defense Lawyers ("NACDL") and the Criminal Justice Act Board for the United States District Court for the District of Massachusetts ("CJA Board") bring an informed perspective to the issue of CCC prisoner placement generally, and to the January 2005 Rule in particular. They have been actively engaged in lobbying and litigation concerning the BOP's change of halfway house policy since it was first announced in December 2002.

a. FAMM is a nonprofit, nonpartisan organization that conducts research, promotes advocacy, and educates the public about issues relating to sentencing justice and sentencing reform. FAMM, whose 12,000 members include criminal justice professionals as well as prisoners and their loved ones, has a strong interest in ensuring that sentences are served in facilities that are appropriate and give the prisoner the best opportunity to reintegrate into society. FAMM frequently is permitted to file amicus briefs in the Supreme Court of the United States, and has had the honor of seeing its briefs cited in the Court's opinions (including in United States v. Booker, 543 U.S. 220, 266 (2005)).

b. The NACDL is the preeminent organization in the United States advancing the mission of the nation's criminal defense lawyers to ensure justice and due process for persons accused of crime or wrongdoing. A professional bar association founded in 1958, NACDL's 13,000 direct members -- and 30,000 affiliate members from 92 state, local, and international organizations -- include private criminal defense lawyers, public defenders, active-duty military defense counsel, law professors and judges committed to preserving fairness within America's criminal justice system. NACDL has an interest in educating the courts concerning the erroneous interpretation of federal statutes by the govern-

ment so as to avoid the forced imprisonment of its members' clients in institutions of higher security than is necessary or appropriate. NACDL has often appeared before this Court as an amicus curiae, and has occasionally been extended the honor of an invitation to participate in oral argument in that capacity.

c. The CJA Board consists of ten attorneys appointed by the United States District Court for the District of Massachusetts to advise the District Court on issues relating to implementation of the Criminal Justice Act Plan of 1993. The CJA Board presents educational programs on federal criminal defense practice in order to guarantee that indigent defendants are well represented. The CJA Board solicits and reviews applications from attorneys who wish to receive appointments under the Criminal Justice Act. Occasionally, the CJA Board expresses its views -- through the filing of amicus briefs and otherwise -- on issues of concern to the indigent defense bar, the defense bar as a whole, and indigent defendants.

Amici have kept their members, and the public at large, apprised of the legal and societal implications of this matter since the BOP announced in December 2002 that CCC placement would be restricted to the last 10 percent of a prisoner's good-time-adjusted sentence, breaking with 40 years of policy and legal analysis. This Court permitted all three organizations to enter an appearance as amici curiae and to present oral argument on behalf of the incarcerated, pro se petitioner in Goldings v. Wynn, 383 F.3d 17 (1st Cir. 2004). Pro bono counsel successfully argued that CCCs are "places of imprisonment" within the meaning of 18 U.S.C. § 3621, and thus available for designation by the BOP at any point in a prisoner's sentence, even prior to the last ten percent. FAMM and NACDL submitted thorough and detailed comments in October 2004 to the BOP Rules Unit, opposing the promulgation of the February 2005 Rule which is challenged in this litigation. Respondent-Appellant relies upon that Rule

-2-

in seeking to restrict the CCC placements of petitioner-appellees Muniz and Gonzalez. Finally, the United States Court of Appeals for the Second Circuit permitted FAMM and NACDL, joined by the New York State Association of Criminal Defense Lawyers, to enter an appearance as amici curiae and to file a brief on behalf of the successful petitioner in Levine v. Apker, 455 F.3d 71 (2d Cir. 2006). Given their expertise and ongoing interest in this issue, amici respectfully suggest that their brief will materially assist this Court in its consideration and disposition of this case.[1]

## ISSUE PRESENTED BY AMICI

Whether the failure of the Bureau of Prisons to take account of pertinent facts placed in the administrative record by members of the public who commented on the proposed rule on CCC utilization policy when it was pre-published for comment, and the Bureau's failure to address the objections of those who commented, render the final rule invalid as "arbitrary and capricious" under the Administrative Procedure Act.

---

[1] Appellees' statements regarding the involvement of the amici in other similar cases (e.g., Fults and Woodall) are mistaken. Pro Se Br. 26. FAMM extended only informal assistance to counsel in Fults, and amici were not in fact aware of or involved in the Woodall litigation in any way.

## SUMMARY OF ARGUMENT FOR AMICI

The Bureau of Prisons' regulation underlying the instant appeal was promulgated after notice and comment under the Administrative Procedure Act. In addition to other arguments presented in the appellees' brief and by amicus Federal Defender, this Court is bound to declare invalid an agency rule promulgated under the APA which is "arbitrary and capricious." Under the Supreme Court's decision in Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983), and this Court's cases following State Farm, the failure of the Bureau of Prisons to take account of facts placed in the record by members of the public who commented on the proposed rule, and the Bureau's failure to address the objections of those who commented, render the final rule invalid under the Administrative Procedure Act.

## ARGUMENT FOR AMICI CURIAE

### THE FAILURE OF THE BOP TO ADDRESS FACTS AND ARGUMENTS ADVANCED IN PUBLIC COMMENTS RENDERED THE FINAL RULE LIMITING CCC UTILIZATION ARBITRARY AND CAPRICIOUS.

Analysis of the federal Bureau of Prisons' ("BOP" or "Bureau") justifications for its final rule ("the Rule") governing the use of Community Corrections Centers ("CCCs" or "halfway houses") shows the Rule to be invalid under the Administrative Procedure Act ("APA").[2] Amici agree with the appellees' conclusion that the Rule does not survive the first step of standard Chevron review due to its patent inconsistent with the governing statute, 18 U.S.C. § 3621(b).[3] Amici contend that the Rule fails because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law," 5 U.S.C. § 706(2)(A) (2000, Supp. IV),[4] when viewed in light of the public comments BOP received between August and October 2004.

In Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983) ("State Farm"), the Supreme Court held that a

---

[2] Amici note that the appellant's Jurisdictional Statement is erroneous. Gov't Br. 1. The district court having had jurisdiction under 28 U.S.C. § 2241(a), this Court has jurisdiction under 28 U.S.C. § 2253(a).

[3] In this Brief, amici do not separately address the validity vel non of the 2002 BOP policy change. Our views on that subject were presented and fully vindicated in Goldings, supra.

[4] Notwithstanding 18 U.S.C. § 3625, APA review is applicable to the type of BOP rulemaking at issue in this case. Compare Gov't Br. 18 n.11 with Martin v. Gerlinski, 133 F.3d 1076, 1079 (8th Cir. 1998); Fristoe v. Thompson, 144 F.3d 627, 630-31 (10th Cir. 1998) ("[W]hile § 3625 may preclude us from reviewing the [merits of] BOP's substantive decision [concerning the individual prisoner] ... it does not prevent us from interpreting the statute to determine whether the BOP exceeded its statutory authority.").

-5-

rulemaking is arbitrary and capricious, violating the APA, if the agency has not "examine[d] the relevant data" or it has failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. 42. A rule is "arbitrary and capricious" if the agency "relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." Id. 43. The Court also noted that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." Id. 42; see Brewer v. Madigan, 945 F.2d 449, 458 (1st Cir. 1991) (concluding that agency "properly examined the relevant data and articulated a satisfactory explanation" for changing its tenant grievance and appeals procedure regulations).

This Court's cases demonstrate a rigorous application of State Farm. Circuit precedent demonstrates that a rule fails judicial review if the promulgating agency did not examine the relevant data and articulate a reasonable explanation for its action, including a rational connection between the facts found and the choice made. Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1284 (1st Cir. 1996) (citing State Farm, 463 U.S. at 43). In particular, an agency rule is "arbitrary and capricious" if the agency gives inadequate treatment to public comments or expert opinion when creating or rescinding the rule. Cf. Natural Res. Def. Council v. U.S. EPA, 824 F.2d 1258, 1283 (1st Cir. 1987) ("where the final rules 'are a result of a complex mix of controversial and uncommented-upon data and calculations,' remand may be in order.").

In Dubois, plaintiffs challenged the United States Forest Service's decision to grant a special use permit to a ski resort that would have allowed expansion of the resort's operations. Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1279-80.

-6-

This Court found that the Forest Service failed to "rigorously explore" reasonable alternatives proposed by several commentators and that a "searching and careful review of the record" indicated the agency's decision was not "founded on a reasoned evaluation of the relevant factors." Id. 1288-89. The agency also failed to articulate a "rational connection between the facts found and the choice made." Id. 1289. Accordingly, this Court held that the Forest Service acted arbitrarily and capriciously under the APA. Id. 1284-85, 1289.

In Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284 (1st Cir. 1995), this Count found arbitrary and capricious a rule change that "completely reversed" previous policy. Id. 291. In adopting the change, the NRC simply circulated two internal staff memoranda and provided no notice to the public. Id. Notably, the memoranda failed to provide "any justification or reasoning whatsoever for the change … did not set forth any new facts, fresh information, or changed circumstances which would counsel the shift. Nor did [the memoranda] provide any legal analysis of how the new policy comported with, or at least did not conflict with, existing agency regulations." Id. Accordingly, this Court concluded that the agency's new policy was "utterly irrational" on its face. Id. 291-92 (emphasis in original).

The Bureau's rulemaking in this case was deficient in ways remarkably similar to the rulemaking assailed in this Court's previous State Farm cases. In 2005, more than two years after adopting a change to its halfway house rules without notice and comment, the BOP attempted to stem the tide of adverse court opinions by making a gesture of compliance with the APA. It published a rule that ignored pubic comment, was based on groundless reasoning, and advanced rationales that courts have consistently rejected.

Amici do not suggest that the Court substitute its judgment for the Bureau's. State Farm, 463 U.S. at 43; Citizens Awareness Network, 59 F.3d at

290; <u>Natural Res. Def. Council</u>, 824 F.2d at 1267. We instead urge the Court to invalidate the Rule because the Bureau failed to "examine the relevant data [or] articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'." <u>State Farm</u>, 463 U.S. at 43 (citing <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)); <u>cf.</u> <u>Lopez v. Davis</u>, 531 U.S. 230, 240 (2001) (BOP may not act arbitrarily and capriciously, <u>citing</u> 5 U.S.C. § 706(2)(A)).

This case concerns the Bureau's rescission of its 40-year practice of honoring its congressionally granted authority to designate prisoners to "<u>any</u> available penal or correctional facility that meets minimum standards of health and habitability." <u>See</u> BOP Program Statement ("P.S.") 7310.04, <u>Community Corrections Center (CCC) Utilization and Transfer Procedure</u> (Dec. 16, 1998) (latest description of halfway house policy) (available at <u>www.bop.gov</u>); <u>see also</u> 18 U.S.C. § 3621(b).[5] This history and the evolution of CCC usage is discussed

---

[5] The government is correct that the BOP, beginning near the end of 2005, began referring to halfway houses as Residential Reentry Centers (RRCs). Gov't Br. 1 n. 2. The government also takes the wise course of continuing in its brief to refer to these facilities as CCCs. <u>Id.</u> For one thing, P.S. 7310.04, the governing program statement that remains unchanged to this day, still refers to them as such. Moreover, public statements regarding the rationale for the revised nomenclature suggest an effort to shape public perception and possibly even to affect the course of this litigation. The agency's Community Corrections Administrator asserted that the BOP "wanted to take advantage of the recent emphasis on reentry and we thought removing 'correctional' from the name might be better for our image." <u>See</u> Stuart Rowles, 47 <u>Community Update: Notes to BOP's Local Partners</u> 1-2 (Dec. 2005). Mr. Rowles did not specify to what "recent emphasis" he was referring, though, at that time, the 2005 version of the 10% Rule, which nullified the impact of this Court's decision in <u>Goldings</u>, was in full effect nationwide, meaning that the BOP refused <u>in toto</u> direct commitments of qualified, sentenced prisoners to CCCs. <u>But see</u> Stuart Rowles, 48 <u>Community Update: Notes to BOP's Local Partners</u> 2 (May 2006) (confirming return to past, pre-December 2002, practices in Third and Eighth Circuits, bowing to <u>Woodall</u> and <u>Fults</u>, respectively). Notably, in the May newsletter, Mr. Rowles both re-confirmed that the BOP's administration had approved the name change and made clear

-8-

in the American Bar Association's ("ABA") comments to the proposed rule change (Special Appendix ("SPA") 37-49).[6] Viewed in context, the Rule is revealed as part of a continuing effort to politicize the problem of crime, in this instance "white-collar" crime, rather than as a reasoned exercise of agency discretion.

The BOP finds its origins in the Three Prisons Act of 1891 and the Federal Bureau of Prisons Act of 1930, which created the single bureaucracy that today operates more than 100 institutions housing 196,000 offenders.[7] As the agency charged with managing the federal prison population, the Bureau is reqired by law to make individualized assessments of offenders' placement and programming needs.  18 U.S.C. §§ 3621(b), 4081.  In complying with this mandate, the

_____(footnote continued)

that it "will not affect existing facilities.... [W]e have used the terms halfway house and CCC synonymously for years and now we can add RRC."  Id. 1. In other words, the RRC label is little more than window dressing.

[6] The documents in the Special Appendix were obtained by counsel for FAMM in response to a request to the office of General Counsel of the Bureau of Prisons, which represented them to be copies of all public comments received.  (Nevertheless, undersigned counsel for amici are aware that the number of comments produced to them (20) does not account for the number the BOP claims were submitted (26).  The failure of the Bureau to make and keep a proper public docket of comments submitted in response to the proposed rulemaking is itself evidence of its lack of genuine interest in receiving those comments, and thus of its failure to comply with the APA.)  This Court can and should take appellate judicial notice of these documents from the official files of a federal agency.  Massachusetts v. Westcott, 431 U.S. 322 (1977) (per curiam).  They are properly brought to the Court's attention in an appendix.  E.I. Dupont de Nemours & Co. v. Cullen, 791 F.2d 5, 7 (1st Cir. 1986) (Breyer, J.).

[7] See Norval Morris, Foreword in ESCAPING PRISON MYTHS:  SELECTED TOPICS IN THE HISTORY OF FEDERAL CORRECTIONS at vii-viii (American Univ. Press, 1994); USDOJ-BOP, Weekly Population Report (accessed April 11, 2007) (available at http://www.bop.gov/ locations/weekly_report.jsp); see also Pub. L. No. 71-218, 46 Stat. 325; S. Rep. No. 533, 71st Cong., 2d Sess. 2 (1930); H.R. Rep. No. 106, 71st Cong., 2d Sess. 1 (1930).

BOP has for many decades used halfway houses as places of imprisonment for qualified inmates.

In the mid-1960s, the Bureau expanded halfway house use to those needing substance abuse treatment, and later to any prisoners found likely to benefit from structured community confinement.[8]  Community corrections grew throughout the 1980s, even after passage of the Sentencing Reform Act of 1984.  Former Directors Norman Carlson (1970-1987) and Michael Quinlan (1987-1992) strongly supported community corrections as a component of the Bureau's overall range of placement options.  The 1984 legislative reformulation of the Bureau's designation authority in 18 U.S.C. § 3621(b) reaffirmed the agency's settled practices.[9]

Around 1985, the BOP's General Counsel issued a legal opinion interpreting the phrase "penal or correctional facility," a phrase used in the then-new § 3621(b), as identical in meaning to "penal institution or facility" in the former 18 U.S.C. § 4082(b).  This opinion upheld the established practice of placing offenders in CCCs either for the duration of their sentences or for up to six months, or more, at the end of their time served.[10]  The Department of Justice's Office of Legal Counsel ("OLC") supported the Bureau's analysis and attendant

---

[8] John W. Roberts, Introduction in ESCAPING PRISON MYTHS, supra note 7, at 12-13; see Pub. L. No. 89-176, 79 Stat. 674 (permitting designation to "facility" along with "institution," and defining former to "include a residential community treatment center").

[9] See S.Rep. 98-225, 98th Cong., 1st Sess., at 141-42 (1983) ("Proposed 18 U.S.C. § 3621(b) follows existing law"); see also 18 U.S.C. § 4082(b) (former provision).

[10] Although mentioned in the press, this opinion has not been made available to the public at-large; a FOIA request made in early 2003 was denied.  See Dan Eggen, White-Collar Crime Now Gets Real Time: New Federal Prison Policy Criticized, Washington Post at A06 (Jan. 7, 2003).

practices through a 1992 legal opinion.  These legal opinions explicitly recognized that halfway houses are among the penal or correctional facilities from which the Bureau may choose when exercising its discretion under 18 U.S.C. § 3621(b) to designate where a prisoner will serve a sentence.

So it was until December 2002, when the BOP, directed by the Justice Department, changed its CCC practice by issuing an internal memorandum. Scant weeks before the rule went into effect, the Bureau notified but did not seek comment from the federal judiciary.  The Bureau did not attempt to comply with the APA notice and comment requirement.[11]

This change placed an immediate and absolute limit on halfway house placement (in most circumstances) to the final ten percent of a prisoner's time served.[12]  One effect of the new policy was to abrogate the longstanding practice of designating a few nonviolent prisoners, subject to sentencing court recommendation or approval, to serve the entirety of their sentences (rarely exceeding a year) in CCCs.  In addition to this "front end" impact, the policy also severely restricted "back end" community reintegration opportunities for most federal prisoners serving sentences of under six years' duration.  See Dismas Charities, Inc. v. U.S. Dept. of Justice, 401 F.3d 666, 669 (6th Cir. 2005) (explaining "front end"/ "back end" terminology).

---

[11] Contrary to the suggestion that the OLC offered the BOP "guidance" (Gov't Br. 4), its memorandum opinion and a memorandum written days later by then Deputy Attorney Larry Thompson to then BOP Director Kathleen Hawk Sawyer are more properly seen as a directive to the agency to abandon immediately its halfway house placement practices.  See infra; Todd Bussert, Peter Goldberger and Mary Price, New Time Limits on Federal Halfway Houses: A shift in correctional policy, 21 Criminal Justice 1, 22-23 (ABA Spring 2006); SPA-121-22 (quoting respective memoranda).

[12] The 10 percent limitation was taken from 18 U.S.C. § 3624(c), a statute which sets the minimum time during which the BOP, if "practicable," is to "assure" each prisoner a plan of pre-release adjustment.  During that final

The sudden December 2002 practice change -- later to be codified in the 2005 Rule under review in this case -- was the subject of considerable litigation, with courts nationwide, including this one, consistently invalidating the BOP's ill-reasoned and defective efforts. This Court's decision in Goldings v. Wynn, 383 F.3d 17 (1st Cir. 2004), was a leading authority. See also United States v. Arthur, 367 F.3d 119, 121 (2d Cir. 2004) (noting that "'the vast majority' of courts to consider the matter have 'held that the new policy was unlawful.'"); Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004).[13]

In August 2004, the Bureau attempted to recoup its position by publishing for comment "propose[d] new rules announcing its categorical exercise of discretion for designating inmates to community confinement when serving terms of imprisonment." 69 Fed. Reg. No. 159, at 51213 (Aug. 18, 2004). Specifically, the BOP proposed to restrict its exercise of discretion in a manner tracking the rigid dictates of the December 2002 OLC opinion. Id.[14]

_____(footnote continued)

period, even home confinement can be utilized as a form of imprisonment.

[13] The 2002 policy change would undoubtedly have been declared invalid by more Circuits had the Department of Justice not embarked on a litigation strategy designed to exploit its exemption from non-mutual collateral estoppel, see United States v. Mendoza, 464 U.S. 164 (1984), by not appealing its numerous losses and settling any non-moot appeals from its few wins. See Ashkenazi v. Attorney General, 346 F.3d 191 (D.C.Cir., Oct. 14, 2003) (gov't appeal held moot); Bugarin-Juarez v. Weiss, 76 Fed.Appx. 773, 2003 WL 21949137 (9th Cir., Aug. 13, 2003) (mem.) (same); Ferguson v. Manco, No. 03-2083 (2d Cir., dismissed Jan. 5, 2004) (prisoners' appeals held moot).

[14] Although the Bureau made an exception from the proposed rule for graduates of the shock incarceration ("boot camp") program, 18 U.S.C. § 4046, it eliminated that program in January 2005, again without advance consultation with the federal judiciary. See Castellini v. Lappin, 365 F.Supp.2d 197 (D.Mass. 2005) (preliminary injunction granted); see also T. Bussert and J. Sickler, Bureau of Prisons Update, Champion (NACDL, March 2005) (Director Lappin cites cost considerations for program closure)

Having purportedly considered the nonexclusive list of factors set forth in §
3621(b) (Gov't Br. 26-27), the BOP justified the change based on four considera-
tions, only two of which even arguably relate to correctional management -- the
agency's sole area of expertise.

Promotion of Consistency
"[T]he Bureau's system before December 2002, which allowed individualized
CCC decisions for each inmate upon initial prison designation, created the
possibility that it would unintentionally treat similar inmates differently."
69 Fed. Reg. 51214.

Consideration of Facility Resources
"Based on its experience, the Bureau has concluded that the resources of
CCCs make them particularly suited as placement options for the final
portion of offenders' prison terms.  CCCs offer increased community access
and greater integration into the community."  Id.

Consideration of Sentencing Commission Policy Statements
"Although guidelines, which are promulgated under 28 U.S.C. 994(a)(1) are
distinct from policy statements promulgated under Section 994(a)(2), the
Bureau believes that both reflect sentencing policy determinations made by
the Sentencing Commission and therefore that the Bureau should also take
cognizance of guidelines in making placement designations.... [Guideline
Section 5C1.1] reflects the Commission's policy determination generally to
restrict the availability of community confinement in lieu of imprisonment
[only as a 'substitute' condition of supervised release within Zone B and C
of the Sentencing Table]."  Id.

Consideration of Congressional Sentencing Policy
"Whether or not Section 3624(c) precludes the Bureau from designating a
prisoner to community confinement for longer than the lesser of the last ten
percent of the sentence or six months, it is consistent with congressional
policy reflected in that section for the Bureau to exercise its discretion to
decline to designate a prisoner to community confinement for longer than

_____(footnote continued)

(available at http://www.nacdl.org/public.nsf/
01c1e7698280d20385256d0b00789923/
9680f6ffdb2ad49e85256fdc00525110?OpenDocument).

-13-

that time period.  In addition to furthering the sentencing policy reflected in Section 3624(c), the proposed rules further Congress' determination that one of the important purposes of sentencing is to deter criminal conduct.  See 18 U.S.C. 3553(a)(2)(B)."  Id.

In response to this "proposed" rule, the Bureau stated that it received 26 comments from the public, only one of which supported the change.  What follows is a discussion of the comments and the BOP's responses to them, 70 Fed. Reg. No. 6, at 1659 (Jan. 10, 2005); SPA-1.

### A.  Eliminating Disparity Where None Existed

Several organizations and one federal judge commenting on the Rule questioned the curious and suspect proposition that it might eliminate 'unintentional disparity' that could arise under the previous process.  Both FAMM and the Honorable Nancy Gertner (U.S.D.J., D.Mass.) observed that the notice for the proposed rule cited no "evidence" or "concrete data" establishing that CCC usage suffered from favoritism or disparity, or that the "possibility" had "materialized to any appreciable extent."  SPA-57, 107.  FAMM submitted that repealing an entrenched agency practice on this tenuous ground was an irrational response to mere speculation, particularly where the Bureau was abandoning its obligation under § 3621(b) to make individualized determinations.  SPA-57.  NACDL echoed FAMM's remarks:

> To the extent that real concern exists about unqualified prisoners receiving direct CCC designations, the solution is not a blanket denunciation of more than 30 years of past practice, but rather a reasoned and appropriate revision to the controlling program statement.  See, e.g., P.S. 5390.88, Intensive Confinement Center (ICC) Program § 8(b) (Nov. 4, 1999) (prohibiting participation by those otherwise qualified prisoners who lack program needs).

SPA-33.  As NACDL also noted, "While 18 U.S.C. § 3621(b) forbids favoritism, it also commands that the BOP consider the history and characteristics of every

-14-

prisoner, as well as 'any statement' from the sentencing court recommending a type of penal or correctional facility as appropriate." Id. The elimination of individualized discretion is not a reasonable method of avoiding the possibility of favoritism, where case by case decisionmaking is exactly what the statute requires.

The Bureau's response effectively ignored these comments, simply reiterating the original, hollow rationale, that it wished to eradicate the possibility of disparity (while not claiming that any actually existed). 70 Fed. Reg. 1660; SPA-2. Indeed, the BOP conceded:

> [W]e made no assertion that the Bureau had, in fact, treated inmates differently or shown favoritism. Rather, we stated that the previous procedures created the possibility that we would unintentionally treat similar inmates differently or, at least, the perception that such a possibility existed. We do not believe that a statement analyzing the previous situation requires further empirical support.

Id. 1661 (emphasis added). This reasoning could as well lead the Bureau to abolish its classification system entirely, on the off-chance a prisoner who qualifies for minimum-security designation might be placed at a medium-security institution, or vice versa. Or, the Bureau might centralize the entire federal prison system at a single location so as to avoid the impression that one prisoner is unfairly placed closer to home than another. As Judge Gertner analogized, the regulation "is like a police officer who, wishing to eliminate racial profiling, opts to arrest everyone (or no one)." SPA-105.

Citing Deputy Attorney General Thompson's December 16, 2002, memorandum and the agency's CCC policies, NACDL observed that the 'potential disparity' justification corresponded to Thompson's interest in restricting placement options for "white-collar" offenders. SPA-33. As detailed in the attached article, on December 20, 2002 — the same day that Director Hawk Sawyer issued a Memorandum for Federal Judges advising of the immediately effective CCC

rule change[15] — and in the days following, Department of Justice representatives speaking to the media couched the policy predecessor to the Rule as a measure intended to strengthen federal prosecutors' power in pursuing high-profile matters. New Time Limits on Federal Halfway Houses, supra, 22-23; SPA-121-22.[16] Indeed, the Justice Department's comments to Director Hawk Sawyer and the media establish that the impetus for the CCC rule change was the unfounded perception that "white-collar criminals"[17] derived a benefit from the CCC policy

---

[15] Available at http://www.nacdl.org/public.nsf/newsreleases/2003 mn005? open document.

[16] In at least one media account, unnamed "aides" to the Attorney General claimed ignorance of the BOP's direct commitment practices until 2001, which supposedly then prompted an internal review and, ultimately the OLC memorandum opinion. NACDL questioned the Attorney General's reported ignorance, since it was common for our members, with a federal prosecutor's full knowledge (and occasional consent), to request judicial recommendations under 18 U.S.C. § 3621(b)(4)(B) for direct CCC designations, understanding that such non-binding recommendations were subject to BOP's individualized assessment. SPA-33. So, too, sentencing courts, including those within this Circuit, sometimes sua sponte recommended direct CCC designations. See also SPA-106 (Gertner, J.: "Presumably, all of the judges country wide who had recommended CCC placements ... were somehow wrong."). With respect to pre-release placement, prior to December 2002, NACDL and CJA Board members' clients frequently received transfers up to six months prior to the completion of their sentences, regardless of sentence length.

[17] The term "white-collar criminal," of course, is used in many ways, with no consistent definition. See SPA-107 (Gertner, J.: "meaning of 'white collar' is ambiguous"). Where the public might conceive of corporate executives convicted of high-dollar financial offenses, numerous less affluent or disadvantaged offenders are convicted of similar crimes, while many wealthier individuals of all social classes are convicted of offenses not normally characterized "white-collar" (e.g., drugs, violence, etc.). It is also noteworthy that the Justice Department's actions came on the heels of the Sarbanes-Oxley Act, which substantially enhanced the penalties for major "white-collar" (financial) offenses, thereby reducing almost to zero the feared "possibility" for either direct CCC designations or six-month, pre-release placements on terms of less than 70 months. Compare Dismas Charities, 401 F.3d at 671 (mistakenly referring to 60-month sentence as cut-off, overlooking the Good Conduct Time adjustment due to § 3624(c)'s use of

-16-

not afforded other classes of offenders and that the Bureau of Prisons was incapable of making any practice modifications necessary to eliminate the supposed disparity.[18]

Notably, the first and only BOP official to speak publicly about the rule change promptly refuted the Justice Department's public relations spin.

> [Bureau] officials said that halfway houses have been used for nonviolent offenders for at least 20 years. 'The point is that it's not just white-collar offenders who have benefited from this long-standing practice,' said Jud[i] Garrett, a spokeswoman for the bureau. 'There are a lot of drug offenders, single moms and ordinary folks who aren't wealthy people who have benefited from this. It's not just Enron types.'

Eric Lichtblau, Criticism of Sentencing Plan for White-Collar Criminals, N.Y. Times (Dec. 26, 2002) (cited in comments from Morris Goldings; SPA-20). Additionally, appended to FAMM's comments was a study by the International Community Corrections Association ("ICCA")[19] entitled The Case for Community-Based Sanctions and Reentry Programming (April 2003), which found that the BOP's own data showed "only about one third of those designated directly to halfway houses are white collar offenders." SPA-79; see also SPA-107 (cited by Gertner, J.). See also Culter v. United States, 241 F.Supp.2d 19, 23

---

_____(footnote continued)

expression "the term to be served" rather than "sentence" or "term of imprisonment"; time served on 70-month term equals almost exactly 60 months).

[18] Indeed, the Thompson memorandum and subsequent public statements, reveal as correct the "gossip" that the Department of Justice's desire to punish 'white-collar' offenders more severely, rather than any legitimate change in BOP philosophy, prompted the policy shift. See Muniz v. Winn, 462 F.Supp.2d 175, 178 & n.6 (D.Mass 2006) (citing Iacaboni v. United States, 251 F.Supp.2d 1015, 1023 (D.Mass. 2003)).

[19] A detailed description of the ICCA, which represents more than 250 private agencies operating over 1,500 residential and community alternative programs throughout the world, can be found on its Web site, http://www.iccaweb.org/.

n.3 (D.D.C. 2003) (revealing that while only 7% of federal prisoners are women, over a third of all inmates designated for service of their full sentences in halfway houses, prior to policy change, were female).

The ICCA highlighted the underlying circumstances in a number of cases where courts had recommended, and the BOP had designated, direct CCC placements, only to attempt transfer after the December 2002 announcement: a sole caregiver for young children; one who cared for seriously ill parents; a defendant who employed several individuals; another whose wife had suffered severe injuries in an auto accident, subjecting her to repeat surgeries, leaving young children otherwise without care; a nonviolent offender who could maintain employment and continue to care for a severely ill 83-year-old mother; the mother of a four-year-old and an infant, who was pregnant with her third child; a defendant who was the sole supporter of a disabled wife in need of surgery; another with serious medical problems demanding regular treatment and consultation with local providers; and a defendant who could obtain drug and mental health treatment, if retained at the CCC, which was unavailable in the subsequently designated institution. Id. 11 n.36, 37; see Iacaboni, 251 F.Supp.2d at 1023 ("vast majority of defendants sentenced to community corrections have been of the distinctly grimy collared variety: bottom-echelon drug mules, single mothers struggling on welfare, men and women who had, after committing their crimes, demonstrably repudiated their old lives and were working steadily and supporting their children-all with minimal or no criminal records and no history of violence"); SPA-107 (Gertner, J.: "in the Court's experience most, direct CCC designations are for small scale offenses, such as filing tax returns or false statements or theft of a letter from the mail, and for offenders scraping to make a living to support their families, not putative Enron defendants").

These types of placements were entirely consistent with the Bureau's well-defined past practices, as contained in the controlling Program Statement, P.S. 7310.04, supra, as well as in the agency's explanation of policy and programming to the federal judiciary. USDOJ-BOP, Judicial Guide to the Federal Bureau of Prisons at 12, 18 (1995) (detailing eligibility criteria and noting that "those serving short sentences of imprisonment who would benefit by maintaining community ties"); USDOJ-BOP, Judicial Resource Guide to the Federal Bureau of Prisons (2000) (same) (cited in NACDL comment; SPA-33). None of the stated criteria gave preference to "white-collar criminals," and, equally significant, placements were made only with the concurrence of the trial court, which stands in a unique position to evaluate the goals of sentencing as balanced against a defendant's needs. See Koon v. United States, 518 U.S. 81, 98 (1996).

The statute does not bar the BOP from identifying categories of inmates for whom, by reason of their own "history and characteristics," CCC placement is inevitably (or even particularly likely to be) "impracticable." See, e.g., United States v. Restrepo, 999 F.2d 640, 645 (2d Cir. 1993); Quezada-Ruiz v. Nash, 2005 WL 1398503 (D.N.J., June 14, 2005) (discussing CCC ineligibility of removable aliens under BOP policy). Section 3621 does authorize the abdication of all discretionary judgment because of a purely hypothetical possibility of unequal treatment. By failing to address any serious way the comments on this issue, the Bureau rendered its final Rule "arbitrary and capricious," requiring its invalidation.

### B. Nothing About CCC Resources Warrants Limiting Placement to the Final Ten Percent of a Prisoner's Time Served.

Invoking undocumented "experience," the BOP suggests that CCC resources are "particularly well suited as placement options for the final portion of offenders' prison terms. CCCs offer increased community access and greater

-19-

integration into the community." 69 Fed. Reg. 51214. In its comments, NACDL identified a lawsuit brought against the Bureau by one its largest CCC contract providers, alleging that the decrease in direct commitments jeopardizes both contractors' financial viability and prisoner rehabilitation efforts. SPA-34 (citing Dismas Charities, Inc. v. U.S. Dept. of Justice, 287 F.Supp.2d 741 (W.D.Ky. 2003) (dismissed for lack of standing).[20] The ICCA expounded on the impact that the cessation of direct designations had on Dismas, noting that had the rule change been in effect for the whole of 2002, Dismas would have lost 10% of its population accounting for approximately 15% of its total "inmate days." SPA-79.

NACDL also referenced the Bureau's 1994 Joint Report to Congress, with the U.S. Sentencing Commission. SPA-34 (citing USSC/USDOJ-BOP, Joint Report to Congress: Maximum Utilization of Prisons Resources (June 30, 1994)). In that report, the BOP asserted that it was continuously revising its "objective classification scheme" with an eye toward, inter alia, "reduc[ing] costs and ensur[ing] that inmates are maintained in the least restrictive environment consistent with correctional [not sentencing] needs." Joint Report at 7. Seeking "to enhance its program opportunities and inmate management strategies in an effort to reach more inmates more effectively, and to help them prepare for a productive, crime-free return to community life after release," the BOP created a two-part community corrections model, accounting for the divergent security concerns and programming needs for front- and back-end placements:

> The pre-release component consists of facilities to assist offenders
> in making the transition from an instisetting to the community. It
> serves as a resource while offenders are under Bureau supervision.
> The community corrections component is designed to be
> sufficiently punitive to be a legitimate sanction, meeting the needs
> of the court and society, yet allowing the offender to undertake
> other responsibilities, such as participation in work, substance
> abuse education, and community service. Except for employment

---

[20] Subsequently affirmed, 401 F.3d 666 (6th Cir. 2005).

and other required activities, offenders in the CCC component must remain in the facility at all times.

Id. 8-10 (emphasis added);  The BOP's own reports have discussed CCCs in much the same terms.  See J. Klein-Saffran, Electronic Monitoring vs. Halfway Houses:  A Study of Federal Offenders in ALTERNATIVES TO INCARCERATION at 24-25 (Fall 1995) (Dr. Klein-Saffran works in the BOP's Office of Research).

Without citing any deficiencies in the "community corrections component," the Bureau answered:

> [T]he resources of CCCs make them particularly well suited as placement options for the final portion of offenders' prison terms. This rule is based in part on a closer look at the particular character-istics and advanof CCCs that make them best suited to particular inmates during the last ten percent of the prison sentence being served, not to exceed six months.
>
> As Congress has itself recognized, those characteristics of CCCs mean they 'afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community.'  18 U.S.C. 3624(c).  By ensuring that offenders sentenced to prison terms not be placed in CCCs except during the last ten percent of their prison sentences (not to exceed six months), the new rule will help ensure that CCCs remain available to serve the purposes for which their resources make them best suited.

70 Fed. Reg. 1660; SPA-2.  There are several problems with this response.  First, the BOP failed to specify what CCC "characteristics" and "advantages" make them best suited for pre-release purposes, or how limiting them to to the final ten percent of a prisoner's time served is more suitable.  Second, the invocation of § 3624(c) was unavailing since that provision makes no mention of halfway houses, nor does it recognize the nebulous characteristics upon which the Bureau relies. Third, the argument evades rather than confronts the public criticism; it fails to address any of the comments about how well-suited a CCC can be for the service of a short sentence in some cases where the defendant needs its resources, nor the comments that some prisoners plainly need a longer time for adjustment than the 10 percent rule allows.

-21-

Avoiding generalities, the ICCA study stressed the need for halfway house time at the end of a sentence, exclusive of any weight to be given sentence length, in terms of administering an effective reentry program:

> [W]here an offender arrives at the halfway house without prospects of housing, employment, or even identification, ... he or she will need four to six months to prepare to return to an unstructured environment. ...
>
>               \* \* \* \*
>
> [M]ost transitional programming consumes the better part of a 120-day stay, and in many cases offenders need a longer time in which to prepare themselves for a return to the free community. ... Under the new DOJ policy, a six-month pre-release placement would not have been possible for the more than 75% of all federal offenders sentenced to prison in 2001 who received a term of less than 70 months. Indeed, even a 90-day placement would not have been possible for the 50% who received sentences of less than 35 months. The 20% who received sentences of less than 12 months would have been eligible for so little CCC time that it would not have been worth sending them there at all.

SPA-77, 80 (citing statistical source); see also Center for Community Corrections comments, SPA-30 at 2 (10 percent limitation "preclude[s] BOP from ensuring an adequate period of pre-release custody for many offenders."); Project Rehab President Mike Reagan's comments, SPA-6 ("as experienced professionals ... we know that for many inmates 10% or six months does not afford a reasonable opportunity to adjust to and prepare for the prisoner's reentry into the community"); ABA, SPA-39 (sentence length should not be the controlling factor in assessing prisoners' placeand transitional needs, citing P.S. 7310.04).

Along these same lines, Dismas Charities "experienced first-hand the adverse consequences that have flowed" from the Rule, to include making "it difficult for prisoners to receive the treatment they need due to the lack of time spent in a CCC prior to re-entry into the community." SPA-90. "Dismas and BOP have found that an offender must be at a CCC for at least 90-120 days to ensure that an offender will have an opportunity to integrate new positive habits

and behaviors into everyday life." SPA-89-90 (citing Univ. of Cincinnati study that concluded "the average length of stay for successful completion of rehabilitation and re-entry programs was 94 days in halfway houses and 136 days in community-based correctional facilities"). Where a federal prisoner transferred to a Dismas-operated CCC for pre-release purposes stayed 120 days, on average, before December 2002, that number had since declined to approximately 90 days, and, at one facility, only 70.5 days. SPA-92. Dismas also reported "increasingly seeking prisoners committed to CCCs for 30 days or less. ... This time period is insufficient to carry out an effective rehabilitation and re-entry program." SPA-93 (numbers had roughly tripled, and noting BOP requirement that Dismas take pre-release commitments regardless of time, including "only several days").

Pursuant to § 3621(b), BOP considerations of pre-release CCC placement focused historically on offender need instead of sentence length during the last 180 days to be served:

> This time assists the offenders in finding a job, locating a place to live, and re-establishing family ties. 18 U.S.C. § 3624(c). Every offender placed in a CCC is provided with a suitable residence, structured programs, job placement, and counseling, and their activities are closely monitored. All centers conduct drug testing and offer counseling for alcohol- and drug-related problems. Inmates' program plans are individualized, tailored to the accountability and program needs of the offender.

1995 Judicial Guide, at 18-19; 2000 Judicial Resource Guide, at 46-47.[21]

With respect to direct commitments, Dismas Charities offered insight from its vantage as a BOP contract provider operating 17 federal halfway house programs, to include during the aftermath of the December 2002 rule change:

> Prior to December 2002, Dismas found the process of designating prisoners to CCCs to be a positive working model in which the sentencing judge, prosecution, defense probation, and the victim were each given an opportunity for input into the final decision for placement. This process allowed each sentencing to be tailored to each individual offender rather than a 'cookie-cutter' approach, assuring that all the interested parties established a meaningful set of consequences for the behavior of prisoners. The effect of the BOP's practice (and proposed rule) is to send all prisoners into institutions, whereas some offenders are better suited to be sent to a CCC.

SPA-90-91; see SPA-105 (Gertner, J., citing Federal Probation article wherein BOP "touted its close relationship with Pretrial Services and Probation, as well as the judiciary").

The Bureau's January 2005 response did not acknowledge or address any of these length-of-stay points directly. See 70 Fed. Reg. 1662 (adhering to misinterpretation of 18 U.S.C. § 3624(c)). SPA-4. Aside from its willful failure to acknowledge meritorious comments, what is perhaps most puzzling about the Bureau's self-imposed restriction on the use of available correcand penal facilities is the incongruity with the Executive Branch's interest in expanding prisoner reentry opportunities. ABA's comments quote both the President and the previous Attorney General suggesting that the BOP should concentrate on

---

[21] As late as the 2000 Judicial Resource Guide, the BOP adhered to a lawful opinion concerning the interplay between 18 U.S.C. §§ 3621(b), 3624(c) and CCC utilization: "[T]he Bureau is not restricted by Sec. 3624(c) in designating a CCC for an inmate ...."); see GAO, Prison Alternatives: Crowded Federal Prisons Can Transfer More Inmates to Halfway Houses, at 1 (Nov. 1991) ("BOP policy encourages the use of halfway houses for inmates during the last 120 to 180 days of their sentences.").

offering greater, not fewer, pre-release opportunities.  SPA-38-39 (ABA Ltr., citing President George W. Bush, Remarks by the President to the 2004 National Urban League Conference (July 23, 2004) ("Let's make sure people have got a chance to get an education and a job."); Attorney General John Ashcroft, Prepared Remarks at the Department of Justice Offender Re-Entry Conference (Cleveland, OH, Sept. 20, 2004) ("A strong and successful re-entry program presents the best opportunity for inmates to become solid citizens upon release."); see FAMM, SPA-62-64 (benefits of community confinement); ICCA, SPA-70-75 (same); Center for Community Corrections, SPA-28.  The BOP did not respond to these observations about the Bush administration's interest in supporting reentry.

In this respect as well, concerning the length of CCC stays, the promulgation of the 2005 Rule violates the APA by arbitrarily and capriciously disregarding the pertinent facts and the substance of the public comments.

### C. Sentencing Commission "Policy" Does Not Disfavor BOP's Traditional CCC Usage.

Congress directed the BOP, in selecting an institution for a sentenced prisoner, to consider, inter alia, any "pertinent" U.S. Sentencing Commission "policy statement," 18 U.S.C. § 3621(b)(5); the statute does not refer to the Commission's "Guidelines."  While acknowledging that "guidelines" are by law different from "policy statements," 28 U.S.C. § 994(a)(2), the BOP nonetheless looks for support in USSG § 5C1.1, which is a guideline, not a "policy statement."  In this way, the proposed rule unmistakably mirrors the rejected foundation of the 2002 OLC opinion.  69 Fed. Reg. 51214.

NACDL addressed this consideration squarely in its comments, quoting extensively from Goldings v. Winn, 383 F.3d at 28.  SPA-34-35; see also FAMM

comments, SPA-59-60 (§ 5C1.1 "does not express a 'general restriction' on the availability of community confinement").  Moreover, by refusing to designate a CCC for service of a sentence even when recommended by the sentencing judge after consideration of § 5C1.1, the BOP actually defeats the policy statement on departures, USSG § 5K2.0 (p.s.), while rendering mandatory and inviolable in all cases a Guideline which is applicable only to a few.[22]  Yet the leading decision on the point held that "imprisonment" at a CCC is permissible, even under the Guidelines Manual, when implementing a judicially determined downward departure.  United States v. Adler, 52 F.3d 20, 21 (2d Cir. 1995) (per curiam)[23] (cited in NACDL comments, SPA-35, along with Reno v. Koray, 515 U.S. 50 (1995) (pre-trial placement at CCC equal to 'official detention' warranting full imprisonment time credit)).  As NACDL noted, the 1994 Joint Report to Congress shows that the Commission was aware of the BOP's CCC practices and took no affirmative steps to address, let alone condemn, them.  Id. 11.

By ignoring the record facts and failing to respond to public comment about the legal error on which the Rule is predicated, the BOP in promulgating its 2005 CCC rule violated the APA in a third respect.

---

[22] In this way, the Rule is also revealed as predicated on a view of the Guidelines as inflexibly mandatory, which was rejected just two days later by the Supreme Court in United States v. Booker, 543 U.S. 220 (2005).

[23] The December 2002 OLC memorandum and the BOP's August 2004 notice cite the Second Circuit's Adler decision as if it stood for almost the opposite proposi.  See 69 Fed. Reg. 51214.

### D. A Presumed Enhancement of Deterrence Cannot Justify Disregard of a Congressional Mandate to Classify Sentenced Prisoners.

In the August notice, the BOP claimed that the Rule furthers deterrence, one of several recognized goals of sentencing. 69 Fed. Reg. 51214. NACDL observed that "the use of CCCs for direct designation and pre-release purposes dates back nearly 40 years, and at no time during this period has BOP ever articulated or intimated concerns about deterrence, even as recently as December 2002 or in subsequent legal defenses to the unlawful rule change." SPA-35.

The deterrence justification proves too much. Accounting for deterrence as a goal of sentencing is committed not to the BOP but to the federal judiciary. See 18 U.S.C. § 3553(a)(1)(B). Even assuming that denying minimum security custody to qualified inmates would enhance the deterrent effect of prison sentences, federal correctional policy, as expressed by Congress, forbids that judgment to the BOP. Unlike some state prison systems, where "prison" always means maximum security, the federal system is built on a statutory mandate for appropriate and individualized classification. Reliance on enhanced deterrence due to increased sentence severity is not a permissible goal under 18 U.S.C. § 3621(b).

The BOP did not address the issue of deterrence in its response, even though it answered criticisms about its failure to provide empirical support for other assertions in the notice. 70 Fed. Reg. 1661; SPA-3. For this reason as well, the Rule is an arbitrary and capricious exercise of the BOP's authority to regulate its decisionmaking under § 3621.

### E. Other Concerns Raised: Cost-Effectiveness

One final issue raised through the comments the BOP received is the increased cost to the agency (and thus to the fisc) as a result of the Rule. The

BOP admits an unspecified increase in costs, but finds it appropriate to absorb the added expenditure in light of its own mission, its interpretation of § 3621(b), "congressional objectives" and Sentencing Commission "policy determinations." 70 Fed. Reg. 1659-60; SPA-1-2.  In addition to its reliance on all the false premises already debunked, this response ignores evidence that community corrections is an well-accepted method to reduce costs without loss of effectiveness (SPA-43, citing 2002 ABA resolution and work of Justice Kennedy Commission), as well as the millions of dollars in societal costs related to the agency's rule (SPA-73 (ICCA)).  Moreover, the cost-is-no-object response is inconsistent with BOP's recent elimination of its boot camp program for cost reasons (note 14, ante).  It also flies in the face of GAO's encouragement to expand CCC use both to reduce costs and to alleviate prison overcrowding (see GAO Prison Alternatives report, supra).[24]  Where the statutory scheme makes what is "practicable" a factor, see 18 U.S.C. § 3624(c), the failure to weigh increased costs as a consideration against the policy change contributes to the conclusion that the new Rule is arbitrary and capricious.  See Public Citizen, Inc. v. Mineta, 340 F.3d 39, 58 (2d Cir. 2003).

---

[24] According to the latest available statistics, released by the Administrative Office of U.S. Courts on June 6, 2006, the annual cost of keeping a prisoner at a CCC was 11% less than the average cost of confinement in a federal prison.  The news release is no longer available on the AO website, but is archived at:  http://realcostofprisons.org/blog/ archives/2006/06/cost_of_incarce.html (accessed April 11, 2007).

For this final reason as well, the BOP's 2005 Rule on CCC eligibility violates the APA as construed by the Supreme Court in <u>State Farm</u>. By ignoring the factual record and by failing to address the reasoning of the organizations that commented on the cost factor, the BOP violated the APA. <u>State Farm</u>; <u>Public Citizen v. Mineta</u>. The 2005 regulation is therefore invalid. This Court should strike it down.

## CONCLUSION

For the reasons discussed in this Brief by amici FAMM, NACDL and the CJA Board, in addition to those presented by the appellees, the judgment of the court below in each of the consolidated cases should be affirmed.

Dated:  April 13, 2007

Respectfully submitted,

*s/Peter Goldberger*
PETER GOLDBERGER*
  *First Cir. Bar # 12112*
50 Rittenhouse Place
Ardmore, PA  19003-2276
  (610) 649-8200
fax: 610-649-8362
<u>peter.goldberger@verizon.net</u>
Member, FAMM Litig. Adv. Comm. &
<u>Vice-Chair, NACDL Amicus Comm.</u>

<u>Attorney of Record for Amici**</u>

---

* <u>Amici</u> wish to thank Professors Ronald F. Wright, Jr. (Wake Forest Law School), David N. Yellen (Dean, Loyola Univ., Chicago, Law School), as well as former U.S. Pardon Attorney and current Director of the ABA's Commission on Effective Criminal Sanctions Margaret Colgate Love, Esq. (Washington, DC), for their suggestions, advice and counsel.

** (Additional counsel on next page)

Additional Counsel:

TODD A. BUSSERT
103 Whitney Ave.
New Haven, CT 06510-1229
  (203) 495-9790

Member, FAMM Litig. Adv Comm. &
Co-Chair, NACDL Corrections Comm.,
Co-Counsel for NACDL

MARY PRICE, General Counsel
Families Against Mandatory
  Minimums Foundation
1612 K St., NW - Suite 700
Washington, DC 20006
(202) 822-6700

CHARLES W. RANKIN
  *First Cir. Bar # 13049*
RANKIN & SULTAN
151 Merrimac St., 2d Fl.
Boston, MA 02114-4717
  (617) 720-0011

Chair, CJA Board
Counsel for CJA Board

MICHAEL L. WALDMAN

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP, Ste. 900
1001 Pennsylvania Ave., NW,
Washington, DC 20004-2505
  (202) 639-7096

Member, FAMM Litig. Adv. Comm.,
Co-Counsel for FAMM Foundation

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed.R.App.P. 32(a)(7)(C), I certify, based on the word-counting function of my word processing system (XyWrite vers. 4.07), that this brief complies with the type-volume limitations of Rule 32(a)(7)(B), as modified by this Court's Order dated April 11, 2007, in that the brief is prepared in a 14-point, proportionally spaced format, and contains fewer than 8200 words, to wit, no more than 8110 words.

_s/Peter Goldberger_____

## CERTIFICATE OF SERVICE

On April 13, 2007, I served two copies of the foregoing Brief on the attorneys for the parties, and one copy on the attorneys in the related case and for the other amicus, by electronic mail and by first class or priority mail, postage prepaid, addressed as follows:

Mark J. Grady, Esq.
Assistant U.S. Attorney
9200 Moakley U.S. Courthouse
One Courthouse Way
Boston, MA  02210

Richard Muniz
Reg. No. 56423-054
FMC Devens Camp I
P.O. Box 879
Ayer, MA  01432

Victor Gonzalez
Reg. No. 90700-038
FMC Devens Camp I
P.O. Box 879
Ayer, MA  01432

Judith Mizner, Esq.
Ass't Fed. Public Defender
408 Atlantic Ave., 3d Fl.
Boston, MA  02110

_s/Peter Goldberger_____